Harold **GARMON**, Jr., et al., Plaintiffs,

v.

John **WARNER**, Secretary of the United States Navy, and the following officers of the United States Marine Corps Reserve Maintenance Battalion, Charlotte, North Carolina, et al., Defendants.

No. C–C–73–1.

United States District Court,
W. D. North Carolina,
Charlotte Division.

March 20, 1973.

On Request For Stay March 22, 1973.

Supplemental Opinion March 28, 1973.

On Motion For Contempt Citation
May 30, 1973.

George S. Daly, Jr., Casey & Daly, P. A., Charlotte, N. C., for plaintiffs.

Keith S. Snyder, U. S. Atty., Asheville, N. C., Hugh J. Beard, Jr., Asst. U. S. Atty., Charlotte, N. C., and Allan A. Ryan, Jr., Captain, United States Marine Corps Reserve, for defendants.

## MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.

### I.

Plaintiffs, five members of the United States Marine Corps Reserve Maintenance Battalion, of Charlotte, North Carolina, filed this action on January 2, 1973, seeking relief from actions of the defendants which would subject them to immediate induction into full time military service if they continue to wear wigs to cover their long hair at weekend Marine Reserve drills. An evidentiary hearing was conducted on January 30 and 31, 1973, upon the motion for equitable relief; testimony from both sides was taken and the case is ready for decision on the merits.

Plaintiffs joined the Marine Reserves during the late 1960's. They work at the Charlotte Maintenance Battalion headquarters where their duties are essentially the maintenance and repair of vehicles and other military equipment. They meet one weekend each month for two drills on Saturday and two drills on Sunday. In addition there is a summer camp exercise of about two weeks. The time occupied by the weekend drills is about two percent of the amount of time in a year, and if the summer camp is added to this the Marines claim about

five percent of the time of each plaintiff during the course of the entire year.

During the summer and fall of 1972, the plaintiffs' hair was longer than the three-inch length and style prescribed in the Marine Corps hair regulations, and each plaintiff started wearing a short-haired wig to the weekend drills. For several months this was not noticed by the authorities of the Marine unit. The wigs stayed in place, were neat and orderly, and as far as appearance is concerned were not out of keeping with the requirements of the regulations. Neither did the wigs interfere in any manner with the performance of the duties of the plaintiffs at the weekend drills.

At the December, 1972, drill, plaintiffs were advised by various defendants that wigs would no longer be allowed and that if plaintiffs came to a weekend drill wearing wigs they would be marked AWOL or given an unsatisfactory rating for all the four drills which take place on a weekend; this could make each of them subject to immediate induction into full time military duty for a period of about one and a half years.

## II.

Plaintiffs are thus threatened with interruption or loss of their civilian ties and income; with disruption of or at least changes in their family and employment status; with measurable financial losses as to several plaintiffs of several thousand dollars each; and with the further emotional and psychological losses which deprivation of liberty for about a year and a half would entail. It may well be that the net dollars and cents loss of *income* that would ensue from a year or two of forced full time military duty would not necessarily exceed $10,000 in the case of any of the plaintiffs. Nevertheless, damages under the law of this state, *e. g.*, Matthews v. Forrest, 235 N.C. 281, 69 S.E.2d 553 (1952), for infringement of personal rights includes pain of mind as well as of body; and although, as someone has suggested, man "does not live by freedom alone," those who deprive other men of it can hardly be heard to say that loss of freedom for such protracted periods of time can not have a value exceeding $10,000. The court is of the opinion that although defendants have not done things which entitle plaintiffs at present to recover $10,000 each, they have made it clear that they intend to do things which may very well if permitted cause losses to the various plaintiffs exceeding $10,000 in special and other damages. Reasonably construed, the evidence supports a finding that any one of the several plaintiffs who testified does have more than $10,000 in controversy, and that this court has jurisdiction under 28 U.S.C. § 1331.

Among the alternative bases of jurisdiction offered by the plaintiffs is 5 U.S.C. § 703, a section of the Administrative Procedure Act providing for court review of "final" administrative decisions. Although the defendants argue that the statute permits judicial review only when jurisdiction is separately established, Yahr v. Resor, 339 F.Supp. 964 (E.D.N.C.1972), such a distinction seems unpersuasive. Congress should not be deemed to have intended, in granting review of *federal* administrative decisions, to leave another "unfortunate gap in the statutory jurisdiction in our federal courts." When permission to seek review was granted by Congress, it must have been done with the intent that all *federal* administrative decisions subject to review be subject to review in the *federal* courts. 5 U.S.C. § 703 is a jurisdictional statute to the limited extent of conferring jurisdiction for review of administrative decisions in the federal courts where such review cannot be predicated on other jurisdictional statutes. Other courts have used 5 U.S. C. § 703 as a jurisdictional statute. Rice v. United States, 348 F.Supp. 254 (D.N.D.1972); Friedman v. Froehlke, 470 F.2d 1351, 1352, n. 1 (1st Cir. 1972). Exhaustion of administrative remedies would be futile and will not be required because General Lanagan, the Commandant of the Marine Corps Re-

serve, testified in the hearing that no change would voluntarily be made in the decision denying reservists the right to wear wigs to drill.

■ Also, the suit may fairly be taken as a request for mandamus under 28 U.S.C. § 1361. Plaintiffs do not ask the courts to require the various defendants to perform a discretionary act; rather they ask that the defendants be required to recognize a constitutional right of the plaintiffs which the defendants threaten to disregard. This is a matter of right, not a matter of discretion; the facts are simple and clear and if the right exists, as I believe it does, there is jurisdiction under the mandamus provisions of 28 U.S.C. § 1361. See Burnette v. Tolson, 474 F.2d 877 (4th Cir., 1973).

Plaintiffs' contentions of jurisdiction under § 1346(a)(2) and § 2201 are not rejected but are not believed necessary to decide, in view of the jurisdiction which adequately exists under § 1331 and the other statutes above discussed.

### III.

Civilian control over the military—a necessity for the survival of human liberty—is rooted in the Constitution. Under Article 2 of the Constitution, the President is the "Commander in Chief of the Army and Navy of the United States." Under Article 1, § 8, it is Congress which has the powers "to raise and support armies * * * to provide and maintain a navy * * * [and] to make Rules for the Government and Regulation of the land and naval Forces." Title 10, U.S.C., § 6011 and § 6012, provide:

"§ 6011. Navy Regulations

"United States Navy Regulations shall be issued by the Secretary of the Navy with the approval of the President.

"§ 6012. Additional regulations for Marine Corps

"The President may prescribe military regulations for the discipline of the Marine Corps."

■ Navy regulations approved by the President, if constitutional, have the force of law. Cafeteria Workers Local 473 v. McElroy, 367 U.S. 886, 891, 81 S. Ct. 1743, 6 L.Ed.2d 1230 (1961).

The record does not reveal presidential approval, but it does show promulgation by the Commandant of the Marine Corps of Marine Corps Order 1020.-34, which reads in pertinent part as follows:

"a. The face shall be kept clean shaven, except a noneccentric mustache is permissible.

"b. Hair shall be worn neatly and closely trimmed. It shall be clipped at the sides and back so as to present an evenly graduated appearance. The hair on top must not be over 3 inches in length. Long or conspicuous sideburns are prohibited."

There is no mention of wigs in the regulation, and no definition of "hair" as meaning natural home-grown hair, as opposed to natural "store-bought" hair.

The "no wig" fiat is therefore not articulated in any approved military regulation, but depends upon a lately created and rigidly maintained, though not written nor codified, policy.

It is fair to observe at the outset, therefore, that despite a long history of short-hair rules dating back to 1840; the Marines do not appear to have an anti-wig regulation that has been adopted and approved in the fashion that the meager pertinent statutes contemplate.

If we pass that problem and deal directly with the substance of the no-wig rule, we reach the question whether the absolute "no wig" prohibition, applied to part-time reservists like plaintiffs, serves any legitimate purpose of the military, and therefore whether it justifies intrusion into the civilian lives of the reservists.

■ One contention of the defendants was that wigs would interfere with military operations; that they might get caught in machinery; that they might endanger the operation of climbing down landing nets and otherwise prevent ade-

quate performance of military duties. The theory advanced is that Marine units are subject to being called on no notice or a few hours' notice to fly away to distant places for immediate assault or combat military duty and that all Marines, reservists or otherwise, must be properly shorn in anticipation of such a call. There is no evidence that any plaintiff's wig has in fact interfered with any military duty. There is no evidence that the local unit or any Marine reserve unit has in recent decades been so called for instant distant combat duty. There is evidence that a barber can cut a head of hair to Marine requirements in a very few minutes, and one witness even said it could be done in a few seconds. The theory of interference with military operations is totally unproved.

■ The second group of contentions advanced to justify the regulation is essentially psychological and theoretical in nature. Marine Corps spokesmen, including the Commandant of the Marine Reserves, General Lanagan, an imposing and intelligent figure, theorized that (a) short hair promotes discipline as a meaningful symbolic distinction between Marines and others; (b) by forcing all Marines, including reservists, to look alike, group identification and the willingness of men to fight for one another are promoted; (c) if part-time reservists are allowed to deviate from the unwritten no wig requirement a spirit of non-cooperation will be fostered between reservists and regulars; (d) morale of other reservists will suffer if some reservists are allowed to wear wigs (the hair of all must be cut because the hair of some has been cut); (e) all orders must be obeyed.

Psychological factors such as these and the others advanced at the hearing can affect morale. In four years of World War II Navy experience I have seen their usefulness in preparing for full time military combat operations. Although it may be debatable whether unthinking obedience is as useful in wartime as initiative, resourcefulness

and adaptability, nevertheless if plaintiffs were full time Marines their case would merit scant consideration.

Plaintiffs, however, are not full time regular military men. They are military five percent of the time and civilian ninety-five percent of the time. Their hair conforms to the standards set out in the text of the regulation. Plaintiffs' alleged violation of the regulation (which does not mention wigs and which does not define hair as either natural or artificial) is the wearing of a conforming wig. The conflict between civilian hair style and military style has been created by an interpretation of the regulation rather than by any clear-cut violation of the regulation by the plaintiffs. All of the psychological problems which are envisaged by the defendants could be solved (as the Army and the Navy have apparently now solved them) by interpreting or amending the regulation so as to allow part-time reservists to wear wigs. That would eliminate all contended violation of military discipline.

No evidence was introduced by any witness that he had felt or suffered or observed any of the envies, the disintegrations nor the impaired morale which the theoretical evidence suggested might come to pass.

It does not appear, therefore, that the theories advanced by defendants constitute adequate military reasons for their action; the regulation is a sweeping regulation of civilian conduct and is not supported by legitimate military need.

Cases from district and appellate courts on this subject are divided. The cases most clearly reasoned and appropriate are the district court decision of Judge Tenney [Harris v. Kaine, 352 F. Supp. 769 (S.D.N.Y.1972)], and the opinion of the First Circuit Court of Appeals by Chief Judge Coffin [Friedman v. Froehlke, 470 F.2d 1351 (1st Cir. 1972)]. In *Friedman*, Judge Coffin conceded that under Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953), the Army could regulate in the area of legitimate military matters

without court interference, but he pointed out that the Army must advance convincing reasons for the legitimacy of certain regulations affecting reservists. Although appearance regulations were proper, the Army, he said, overstepped the line when it prescribed the method by which the desired appearance was to be achieved. In pertinent portion the opinion said:

" * * * If *Orloff's* staking out of an exclusive military jurisdiction to determine 'legitimate Army matters' is to have any other meaning than that the Army may determine any matter which it sees fit to determine, there must exist a minimal burden to bring the determination within the boundaries of legitimacy.

\* \* \* \* \* \*

"The interest of plaintiffs, as both the district court and defendants have recognized, is in this circuit treated as a freedom protected against unjustified encroachment. Richards v. Thurston, *supra* [424 F.2d 1281 (1st Cir. 1970)]. It may not be so important a right as to prevent the Army from regulating hair length and style of its full-time personnel. But, insofar as members of the reserve are concerned, who, under their contracts, are allowed to work and live in civilian society for most of the time, the right to wear their hair as they please is not so trivial as to be denied without any service-connected reason. Lacking any such reason, we hold, as did Judge Tenney in his thorough opinion in Harris v. Kaine [352 F.Supp. 769] (S.D.N.Y.1972), issued subsequent to the district court's decision, that this regulation is invalid in that it exceeds statutory authority and attempts to control matters which are not legitimately within the province of Army and Guard regulation. While not in disagreement with the alternative holding in *Harris* that the regulation is also unconstitutional, we do not find it necessary to face that question."

### IV.

Plaintiffs also proffer a constitutional argument in support of their claims. The analysis required is quite similar to the preceding analysis of the lack of statutory basis for the no wig rule.

 Generally speaking, people have the right to wear their hair as they wish, and this right is protected by the due process clause. Massie v. Henry, 455 F.2d 779 (4th Cir. 1972); Richards v. Thurston, 424 F.2d 1281 (1st Cir. 1970); Union Pacific Ry. v. Botsford, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891). However, this is a "civilian" right and full time soldiers may not be entitled to assert it. Yet the situation is drastically different when the military man is military for only two percent or five percent of his time, but civilian for the other ninety-five to ninety-eight percent of his time. Under these circumstances the wig rule must be supported, if supportable, by showing that the particular infringement of personal liberty (no wigs) bears a necessary and substantial relationship to the furtherance of a legitimate national interest (military efficiency, discipline and performance).

For reasons already stated, the Marine Corps falls far short of establishing legitimate reasons for this military intrusion into the reservists' civilian lives. The regulation is unconstitutional as applied.

### V.

 Defendants contend that plaintiffs waived any right to object to Marine hair regulations by voluntarily signing enlistment contracts knowing the Corps regulates personal appearance.

There are two problems with this contention. In the first place, there was no evidence that any plaintiff knew wigs were taboo for reservists; the hair regulation does not mention wigs, and the no wig rule did not even exist when they enlisted. There was no knowing and voluntary relinquishment of an understood right; the requisites of waiver do

not exist. See Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 LEd. 1461 (1938).

In the second place, it would be exceedingly unwise policy to deny to military volunteers the right to go to court to challenge the military wisdom or the constitutional validity of military regulations. The military is already protected from any saturation barrage of court orders by the narrowness of the scope of available review. See *Orloff, supra.* There is no need to increase that protection by implying a waiver where none in fact took place.

It is therefore ordered that the enforcement of the "no wig" rule be and hereby is permanently enjoined, but only insofar as it prevents plaintiff reservists from attending weekend drills wearing short-haired wigs that otherwise conform to the Marine Corps hair regulations.

## IN REQUEST FOR STAY

The defendants have requested a stay of the judgment entered in this case on March 20, 1973.

Since this suit was filed no temporary restraining order has been in effect, but plaintiffs have been excused from drill under an informal understanding that this would not adversely affect their Marine Corps standing. So far as the court knows, they still wear long hair.

The petition for a stay does not indicate what the defendants desire or intend to do about continuing this arrangement. If they wish to continue the present arrangement under which plaintiffs will either be excused from drill or will be allowed to attend drill wearing wigs—without penalty in either event— the court has no objection to a stay.

However, if the effect of a stay would be to subject plaintiffs to immediate renewed jeopardy because of the hair problem, then a stay would simply be a reversal of the decision already made

and would amount to a decision in favor of the defendants, which I do not believe ought to be rendered.

The only way to preserve the status quo is either to deny the stay or allow the defendants to subject themselves to an informal continuation of the present arrangement under which they have been insistently chafing since they filed their own brief in the matter in late February.

Before ruling on the stay, therefore, the court requests the United States Attorney to advise in writing precisely what the Marine Corps intends to do and for what period of time, if a stay is rendered.

## SUPPLEMENTAL OPINION

The United States Attorney advises that no continuation of the status quo, informal or otherwise, is agreeable to the Marine Corps.

The March 20, 1973 order of this court is based on the principle that the actions of the Marines exceed the statutory authority under which they operate, and unwarrantedly and unreasonably and probably unconstitutionally intrude upon the civilian lives and freedoms of the plaintiffs.

To stay the mandate of that order pending appeal would subject the plaintiffs to the Hobson's choice of either having their hair cut, thereby surrendering the freedom at issue, or refusing to have their hair cut, thereby incurring the penalties with which they have been threatened.

One is reminded of Candide's somewhat similar dilemma, described by Voltaire as follows:

" . . . One fine spring day he thought he would take a walk, going straight ahead, in the belief that to use his legs as he pleased was a privilege of the human species as well as of animals. He had not gone two

leagues when four other heroes, each six feet tall, fell upon him, bound him and dragged him back to a cell. He was asked by his judges whether he would rather be thrashed thirty-six times by the whole regiment or receive a dozen lead bullets at once in his brain. *Although he protested that men's wills are free and that he wanted neither one nor the other, he had to make a choice*; by virtue of that gift of God which is called *liberty*, he determined to run the gauntlet thirty-six times and actually did so twice. There were two thousand men in the regiment. That made four thousand strokes which laid bare the muscles and nerves from his neck to his backside. As they were about to proceed to a third turn, Candide, utterly exhausted, begged as a favor that they would be so kind as to smash his head; he obtained this favor; they bound his eyes and he was made to kneel down. At that moment. the King of the Bulgarians came by and inquired the victim's crime; and as this King was possessed of a vast genius, he perceived from what he learned about Candide that he was a young metaphysician very ignorant in worldly matters, and therefore pardoned him with a clemency which will be praised in all newspapers and all ages. An honest surgeon healed Candide in three weeks with the ointments recommended by Dioscorides. He had already regained a little skin and could walk when the King of the Bulgarians went to war with the King of the Abares." (Emphasis added.)

Even if plaintiffs are not entitled to the freedom I believe they have, no harm to the defendants will ensue if they wait until some court denies plaintiffs that freedom. If plaintiffs do have the rights I believe they have, they should not be required to give them up so that defendants can pursue a vain appeal. Forfeiture of freedom (if ordered at all) should follow—not precede—fair trial.

The request for a stay of the March 20, 1973 order is denied. However, if the Marines elect to continue the informal status quo, that will be accepted as compliance with the order pending appeal.

## ON MOTION FOR CONTEMPT CITATION

This case was heard May 22, 1973, upon motion of the plaintiffs Garmon and Dugan for a contempt citation.

The evidence shows a crackdown by the defendants on wig-wearing reservists immediately after this court's previous order; however, the court does not conclude that there was intentional disregard of the order and the petition for a contempt citation is denied.

Nevertheless, the future attitude of the Marines towards reservists who wear wigs by contrast with reservists who do not wear wigs will continue to be a subject for proper consideration by this court; the subject matter (hair) may be lightweight, but the principle involved (freedom of expression and harmless conduct) is a heavyweight affair. The question is, how to resolve the remaining practical impasse.

Having due regard for Captain Wise's aversion to ducktail or less-than-tapered haircuts (wigged or otherwise), I suggest that instead of firing at each other at long range via the courts, the parties come to hand-to-head combat by allowing the plaintiffs to bring their wigs and their barber to the next Marine drill and have the wigs tailored by the barber to a style which will pass Captain Wise's inspection.